**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>   Plaintiff,<br><br>v.<br><br>Manuel de Jesus Garcia-Lopez, et al.,<br><br>   Defendants. | No. CR-13-01609-PHX-NVW<br><br>**ORDER** |

Before the court are Defendants' Motions to Suppress (Doc. 57, 61). For the reasons that follow, the Motions will be denied.

**I.   BACKGROUND**

During an investigation of the Castro drug trafficking organization, agents with Homeland Security Investigations (HSI) learned in 2012 that Indalecio Castro-Ponce had delivered narcotics to California, Nevada, and Arizona as part of a drug-smuggling operation that involved a man known as Lalo. (Doc. 57-1 at 22.) Yuma County Superior Court Judge John Nelson authorized interception of Lalo's phone, which was designated Target Telephone 1 ("TT 1"), on December 10, 2012. (*Id.* at 25.) Based on information obtained from TT 1, as well as other sources, HSI Special Agents Christian Murphy and Andrew Thompson submitted a warrant application and supporting affidavit to Judge Nelson on January 8, 2013, seeking authorization to intercept calls on Defendant Manuel

de Jesus Garcia-Lopez's phone, which HSI labeled Target Telephone 3 ("TT 3"). (*Id.* at 67-68).

According to that affidavit, HSI intercepted a call between TT 1 and TT 3 on December 11, 2012. (*Id.* at 25.) HSI initiated signal tracking of TT 3 and determined that the phone belonged to Garcia-Lopez. On December 20, 2012, HSI obtained a warrant, signed by Yuma County Superior Court Judge David Haws, that authorized them to install a mobile tracking device on Garcia-Lopez's vehicle for ninety days. The court has previously upheld the lawfulness of that warrant. (*See* Doc. 72.)

The tracking device revealed that between December 29 and December 31, 2012, Garcia-Lopez visited the Morongo Casino and Resort in Cabazon, California. (Doc. 57-1 at 26.) While in California, Garcia-Lopez spoke over the phone with Lalo and "stated that he was giving his friend a ride to look at some farming machinery in Arizona." (*Id.*) Special Agents Murphy and Thompson wrote in their affidavit that they did "not know why [Garcia-Lopez] was not honest with LALO about where he was, but based on your Affiants' training and experience, and the training and experience of their fellow agents, it is known that narcotics traffickers will often keep trafficking operations secret from trafficking associates in order to avoid having to share the profits of the venture with additional people." (*Id.*)

On December 14, 2012, agents intercepted a call between TT 1 and a new number, 128*754*124. (*Id.* at 27.) Through signal tracking technology and a records check, HSI identified the user of the 128*754*124 number as Jorge Cordova. (*Id.*) The next day, "LALO told CORDOVA that he had left 3 'girls' with 'Manuel.'" (*Id.*) The affidavit interprets this comment to mean that "'Manuel' is [Garcia-Lopez], and the girls are 3 units of an unknown illegal drug." (*Id.*) Signal tracking demonstrated that the user of the 128*754*124 number "had crossed through the San Luis, AZ Port of Entry (POE) sometime between 12:00 and 12:15" on December 15, 2012, and a "check of the border crossing records showed that a Jorge CORDOVA-Ortega (03/18/1951) crossed through the POE at 12:01." (*Id.*)

Pursuant to Judge Nelson's December 10, 2012 order, HSI intercepted a call between TT 1 and TT 3 on December 29, 2012. (*Id.* at 42.) On that call, Lalo remarked that Garcia-Lopez had stopped answering his phone and asked whether Garcia-Lopez had placed Lalo on the bench. (*Id.*) Garcia-Lopez denied placing Lalo on the bench, and the two men briefly discussed horse-racing. (*Id.* at 42-43.) Lalo then asked Garcia-Lopez whether he would work again on Sunday. (*Id.* at 43.) Garcia-Lopez responded that he did not know, and mentioned that he was "over by some ranches with a buddy who came to see some machinery." (*Id.*) According to the affidavit, "When LALO asks if [Garcia-Lopez] placed him on the bench, he is asking if [Garcia-Lopez] is no longer using LALO in his trafficking operations. . . . Your Affiant asserts that when LALO says work, he is referring to narcotics trafficking." (*Id.*) The affidavit also asserts that Garcia-Lopez lied to Lalo when he said he was "over by some ranches." (*Id.*) In fact, both "Signal Tracking Technology and the Mobile Tracking Device showed that [Garcia-Lopez] was traveling to Cabazon, CA at the time of this call and was located on California Highway 86 on the east side of the Salton Sea." (*Id.*) The affidavit concludes: "clearly, [Garcia-Lopez] did not want LALO to know what he was actually doing." (*Id.*)

In addition to reciting the above facts, the affidavit contains the results of a "toll analysis" Special Agents Murphy and Thompson conducted of TT 3. That analysis shows that between November 20, 2012, and December 31, 2012, TT 3 made thirteen outgoing calls to 72*12*23900, a telephone number belonging to someone who goes by the alias Alguate. (*Id.* at 32, 44.) The affidavit describes Alguate as "one of LALO's most frequently contacted numbers" and as being "involved in the sales and distribution of narcotics." (*Id.* at 32.) The Drug Enforcement Administration had previously intercepted calls Alguate made during a state wiretap in Carlsbad, California. (*Id.*) During one November 9, 2011 call, Alguate, using the same number, "was complaining about a missing load of narcotics that was lost by the targets of that Carlsbad investigation and subsequently stopped communicating with those targets." (*Id.*) He was also intercepted as part of another DEA investigation in Riverside, California. (*Id.*)

"During these calls," the affidavit explains, "which occurred between January 31, 2012 and March 1, 2012, ALGUATE was the Mexicali source of supply who was supplying 10 pound quantities of methamphetamine to targets of the Riverside investigation approximately every two weeks." (*Id.* at 32-33.)  Finally, "ALGUATE, using 72*12*23900, was also intercepted during another DEA wiretap investigation of a target known as CHALINO." (*Id.* at 33.)

The toll analysis also demonstrates that between November 25, 2012, and December 25, 2012, TT 3 made twenty-six outgoing calls to 128*753*190. (*Id.* at 44.) On December 20, 2012, that number made a call to TT 1 in which the dialer—known as UM 3190—told Lalo "he was trying to work with some new people." (*Id.*)  He also said "he was working with some cholos and would let LALO know if anything came up because things are slow." (*Id.*)  The affidavit interprets those comments as follows: "When UM 3190 says he is trying to work with some new people, your Affiant asserts that he is saying that he is going to start smuggling narcotics with a new smuggling cell. When UM 3190 says that he is working with some 'cholos' he is referring to gang members." (*Id.*)

On January 8, 2013, Judge Nelson, relying on the affidavit submitted by Special Agents Murphy and Thompson, signed an order authorizing state and local agents to intercept calls made by and to TT 3. The order also authorized interception of calls on a phone known as Target Telephone 2 ("TT 2") and renewed authorization for interception of TT 1. (*Id.* at 18.)

Signal tracking of TT 3 indicated that on January 21, 2013, Garcia-Lopez traveled to the Phoenix home of "a woman known only as 'GUERA.'" (Doc. 61-1 at 15.) He then returned to the home of Defendant Maria Concepcion Ramirez in Yuma, "where he called an unidentified female (UF) and explained that a bundle of cash was short $200." (*Id.*) Two days later, on January 23, 2013, agents intercepted a call between Garcia-Lopez and the UF in which Garcia-Lopez said he would travel to Phoenix that night and meet with the UF the next morning. (*Id.*) On the morning of January 24, 2013, Garcia-

- 4 -

Lopez spoke over the phone with the UF several times and made arrangements "to pick something up." (*Id.*)  Agents "observed [Garcia-Lopez] drive to GUERA'S house and pick up a small cardboard box, then begin driving back to Yuma." (*Id.*)  Before he arrived at Guera's house, "an UF was seen leaving" the premises. (*Id.*)

Agents asked the Yuma County Sheriff's Department to pull over Garcia-Lopez's car. (*Id.*)  He was stopped for speeding and following too close, and during a consent search, a drug-sniffing dog alerted to a box containing $509,275 in cash. (*Id.* at 15-16.)  When sheriff's deputies asked Garcia-Lopez for his home address, he provided a Yuma address that was foreclosed on in 2012 for failure to pay property taxes and make mortgage payments. (*Id.* at 16.)  He also told deputies he worked for Figo Harvesting, but state records show he received no wages from that company in 2011 or the first quarter of 2012; the "company reported no wages for the second quarter of 2012, and wages for the third and fourth quarter of 2012 were not available." (*Id.* at 14, 16.)  The affidavit submitted by Special Agents Murphy and Thompson characterizes these statements as evidence that Garcia-Lopez "is attempting to cover up his actual home address and employer." (*Id.* at 17.)

Following Judge Nelson's January 8, 2013 order, HSI also intercepted Garcia-Lopez making or receiving several phone calls that they contend pertain to drug trafficking and the smuggling of cash proceeds back to Mexico. (*Id.* at 2-3.)  For example, on January 21, 2013, Garcia-Lopez made a call to a number associated with what came to be known as Target Telephone 4 ("TT 4"). (*Id.* at 25.)  Sprint records indicate TT 4 belongs to Ramirez. (*Id.* at 28.)  Ramirez said she was "out there buying what they will need," which the affidavit contends means Ramirez was "purchasing items to be used in conjunction with the narcotic proceeds being transported" by Garcia-Lopez. (*Id.* at 25.)

On January 24, 2013, shortly before he was pulled over by the Yuma County Sheriff's Department, Garcia-Lopez called Ramirez and told her that "what he (Manuel LOPEZ) is going to do is drop off the document for her (Maria RAMIREZ) to start

1 organizing them and he (Manuel LOPEZ) will cross walking and will cross back." (*Id.* at
2 26-27.)  He also instructed Ramirez "to organize them calmly." (*Id.* at 26.)  The affidavit
3 explains: "When Manuel LOPEZ says he is going to drop off the 'documents' for her
4 (Maria RAMIREZ) to start organizing them, we contend the 'documents' are currency,
5 and organizing them is counting the currency.  When Manuel LOPEZ says that he will
6 'cross,' we assert that he is referring to crossing into Mexico." (*Id.*)  Further, "When
7 Manuel LOPEZ says that she should 'organize them calmly,' we assert that he is telling
8 Maria RAMIREZ to take her time and count the cash carefully." (*Id.*)

Later that night, after he had been released by police, Garcia-Lopez used TT 3 to call Ramirez on TT 4.  (*Id.* at 27.)  Garcia-Lopez said "that if he (Manuel LOPEZ) comes out, he'll become more famous. . . . Maria RAMIREZ sa[id] there's nothing right now but there might be something tomorrow." (*Id.*)  The affiants interpret the "coming out" comment as "referring to news of the seizure earlier in the day of $509,275.00 USD cash from him. . . . Maria RAMIREZ is stating that she has not heard of the seizure from any third parties." (*Id.*)

Garcia-Lopez also spoke on the phone twice with someone named Martin,[1] allegedly about the possibility of bribing the Mexican army to gain access to a drug-smuggling tunnel that connects Mexico and the United States. (*Id.* at 18-20.)  In addition, Garcia-Lopez called a man named Raul Perez to discuss shipping horses to Chicago, and placed a call to Unidentified Female 8258 regarding "the 'long bag'" that was "short 200." (*Id.* at 20-23.)  The affidavit asserts that the latter two conversations refer to shipping drugs and laundering money. (*Id.* at 22-23.)  All four of these conversations use vague or cryptic language that is susceptible of other, less incriminating interpretations. (*See id.* at 18-23.)  Garcia-Lopez's call to Unidentified Female 8258 was placed from Ramirez's home. (*Id.* at 22, 25.)

---

[1] The affidavit does not appear to explain who Martin is or his connection with the rest of the alleged drug conspiracy.

1    Special Agents Murphy and Thompson included the post-January 8, 2013
2 information described above in an affidavit submitted to Judge Nelson.  That affidavit
3 also contained the results of a "toll analysis" of TT 4, which showed that between
4 December 30, 2012, and January 30, 2013, TT 4 made 238 outgoing calls to
5 128*752*106. (*Id.* at 28.)  That number belonged to Cecilio Rodriguez, who may have
6 been Ramirez's husband or ex-husband, and whom the affidavit summarily "assert[s] to
7 be a criminal associate of [Garcia-Lopez]." (*Id.* at 10, 28.)  Rodriguez, the affidavit
8 claims, "is a deported aggravated felon," "lives at [Garcia-Lopez's] horse ranch in San
9 Luis Rio Colorado, Sonora, MX," "has been convicted of drug and weapons related
10 felonies in Yuma County, and is also a sex offender." (*Id.* at 10.)

11    On February 6, 2013, Judge Nelson signed an order authorizing interception of TT
12 4 and continued interception of TT 3.  Garcia-Lopez now seeks to suppress any evidence
13 gathered from the wiretap conducted pursuant to Judge Nelson's January 8, 2013
14 authorization, arguing the affidavit submitted by Special Agents Murphy and Thompson
15 did not establish probable cause to believe Garcia-Lopez had committed or was
16 committing a crime.  In addition, he claims any evidence obtained as a result of Judge
17 Nelson's second authorization, of February 6, 2013, is tainted as the "fruit of the
18 poisonous tree" because the information supporting that second authorization derived
19 from the allegedly unlawful first authorization.  Regardless of the source of the second
20 affidavit's information, Garcia-Lopez maintains that information is inadequate to
21 establish probable cause for continued interception.

22    Defendant Ramirez similarly contends that any evidence from the wiretap of TT 4
23 is tainted as poisonous fruit.  In any event, she argues, Special Agents Murphy and
24 Thompson's second affidavit was insufficient to support a finding of probable cause.

## II.    LEGAL ANALYSIS

The admissibility of evidence gathered through wiretaps is governed by the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-2522 (the "wiretap

statute"). *United States v. Reed*, 575 F.3d 900, 908 (9th Cir. 2009). Under that statute, a law enforcement officer may submit an application for, and a "judge of competent jurisdiction" may enter, an "an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications." 18 U.S.C. § 2518(1), (3). The judge may authorize a tap if he finds "probable cause to believe (1) that an individual is committing, has committed, or is about to commit specified offenses . . . ; (2) that communications relevant to that offense will be intercepted through the wiretap; and (3) that the individual who is the focus of the wiretap investigation will use the tapped phone." *United States v. Meling*, 47 F.3d 1546, 1552 (9th Cir. 1995) (citing 18 U.S.C. § 2518(3)(a), (b), (d)). Notwithstanding prior judicial authorization, "[a]ny aggrieved person in any trial, hearing, or proceeding in or before any court . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to" the wiretap statute on certain enumerated grounds. 18 U.S.C. § 2518(10)(a). "Suppression is required: (i) if the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." *United States v. Duran*, 189 F.3d 1071, 1084 (9th Cir. 1999) (citing 18 U.S.C. § 2518(10)(a)). A district court must therefore suppress wiretap evidence if the affidavit offered in support of the application does not establish probable cause. "Looking only to the four corners of the wiretap application, [a reviewing court] will uphold the wiretap if there is a 'substantial basis' for these findings of probable cause." *Meling*, 47 F.3d at 1552.

The standard for evaluating probable cause in statutory wiretap cases is the same as that for evaluating probable cause in other contexts. *See United States v. Ortiz*, No. C 12-00119 SI, 2013 U.S. Dist. LEXIS 181423, at *6-8, 11-12 (N.D. Cal. Dec. 27, 2013) (applying Fourth Amendment standard of probable cause to motion to suppress under 18 U.S.C. § 2518); *accord United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988) ("We begin our analysis by noting that affidavits in support of electronic surveillance

1 orders are to be judged by the same standards as conventional search warrants; the
2 statutory probable cause standards set out in Title III are co-extensive with the
3 constitutional requirements embodied in the fourth amendment."). Probable cause
4 "means a 'fair probability' that contraband or evidence is located in a particular place.
5 Whether there is a fair probability depends upon the totality of the circumstances,
6 including reasonable inferences, and is a 'commonsense, practical question.' Neither
7 certainty nor a preponderance of the evidence is required." *United States v. Kelley*, 482
8 F.3d 1047, 1050 (9th Cir. 2007) (citations omitted). "Normally, [reviewing courts] do
9 not 'flyspeck' the affidavit supporting a search warrant through de novo review; rather,
10 the magistrate judge's determination '"should be paid great deference."' In addition, the
11 Supreme Court has reminded reviewing courts that '[a]lthough in a particular case it may
12 not be easy to determine when an affidavit demonstrates the existence of probable cause,
13 resolution of doubtful or marginal cases in this area should largely be determined by the
14 preference to be accorded to warrants.'" *Id.* at 1050-51 (alteration in original) (citations
15 omitted).

16      **A.**    **The January 8, 2013 Affidavit**

17      The information in Special Agent Murphy and Thompson's original affidavit does
18 not prove Garcia-Lopez's involvement in a drug or money laundering conspiracy. But
19 reasonable inferences drawn from the affidavit do establish a "fair probability" that
20 Garcia-Lopez was committing a crime, communications relevant to that crime could be
21 intercepted over his phone, and Garcia-Lopez would use that phone. Lalo, another target
22 in HSI's investigation, told an associate he had given three "girls" to someone with
23 Garcia-Lopez's first name; the affiants attested, based on their knowledge and
24 experience, that the "girls" referred to units of illegal drugs. Garcia-Lopez spoke with
25 Lalo about placing him "on the bench" and doing "work"—language the affiants
26 interpreted as a reference to drug trafficking. In addition, Garcia-Lopez made numerous
27 calls to a man, Alguate, who had previously been implicated in at least three DEA
28

investigations. Garcia-Lopez was deceptive toward at least one other suspected member of the alleged drug conspiracy.

By themselves, none of these facts would be adequate to support probable cause. The three "girls" Lalo mentioned to Cordova might not be contraband, and Manuel is a common name. Phrases like "work" and "on the bench" are similarly ambiguous. Had these statements not been made in the context of a long-term investigation into a sophisticated drug trafficking organization, their probative value in establishing probable cause would be minimal, notwithstanding the affiants' allegedly expert interpretation of them. *Cf. United States v. Cervantes*, 703 F.3d 1135, 1139 (9th Cir. 2012) ("[The] 'purely conclusory' statements of officers, without detailing any of the underlying circumstances, will be insufficient to establish probable cause."). Likewise, deception, even a pattern of deception, and phone calls to other suspected criminals are not necessarily indicative of criminal activity. *See United States v. Huguez-Ibarra*, 954 F.2d 546, 552 n.3 (9th Cir. 1992) ("It is well established that mere association with known or suspected criminals does not give rise to probable cause."). But a magistrate could reasonably conclude that, taken together, these facts added up to probable cause. The court cannot say that Judge Nelson's January 8, 2013 authorization lacked a "substantial basis." Given the "great deference" reviewing courts owe to judges who authorize wiretaps, Garcia-Lopez's motion to dismiss evidence obtained through HSI's original wiretap must therefore be denied.

Ramirez was "a party to" several "wire, oral, or electronic communication[s]" intercepted pursuant to Judge Nelson's original order. 18 U.S.C. § 2510(11). She therefore has "standing" to challenge the sufficiency of the affidavit on which that order was based. *See id.* § 2518(10); *United States v. Oliva*, 705 F.3d 390, 395 (9th Cir. 2012) (discussing standing requirements). Nevertheless, her motion to suppress the fruits of the January 8, 2013 order must fail for the same reasons that Garcia-Lopez's motion fails.

### B. The February 6, 2013 Affidavit

Garcia-Lopez and Ramirez both seek to suppress evidence obtained from Judge Nelson's second authorization on the grounds that the supporting affidavit signed by Special Agents Murphy and Thompson contained information tainted by the allegedly unlawful authorization of January 8, 2013. As explained above, Judge Nelson did not obviously err in finding that initial authorization to be supported by probable cause. Accordingly, suppression is only warranted if—regardless of the source of the information it contains—Special Agents Murphy and Thompson's second affidavit did not provide a sufficient foundation for probable cause.

The circumstances described in the second affidavit warrant the "commonsense, practical" conclusion that both Defendants were involved in criminal conduct, evidence of which could be found by tapping their phones. On January 21, 2013, Garcia-Lopez called Ramirez, who told him she was "buying what they [would] need." Two days later, Garcia-Lopez traveled to the Phoenix home of a woman named Guera, where he picked up a "small cardboard box." He then called Ramirez to tell her he was going to "drop off the document for her . . . to start organizing them." When sheriff's deputies stopped his vehicle several hours later, they found $509,275 in cash in a cardboard box. He provided evasive answers to questions about his employment and place of residence. Garcia-Lopez called Ramirez later that night and had a conversation that, while susceptible of multiple interpretations, could reasonably be understood to refer to others' discovery of his arrest that afternoon. Following a previous visit to Guera's home, Garcia-Lopez called an unidentified female to discuss "the 'long bag'" that was "short 200."

Other information in the affidavit—such as the toll analysis showing Ramirez made frequent calls to a husband or ex-husband who had previously been convicted of drug and weapons felonies—contributes little to probable cause. Nevertheless, the series of calls between Garcia-Lopez and Ramirez, as well as the discovery of over half a million dollars' cash in Garcia-Lopez's car, give rise to an inference of criminal conduct. That inference receives additional support from other facts in the affidavit, including

- 11 -

1 Garcia-Lopez's suggestive, if ambiguous, conversations with Martin, Perez, and
2 Unidentified Female 8258, and his use of Ramirez's home to speak with Unidentified
3 Female 8258.  In light of this evidence, Judge Nelson's February 6, 2013 order was not in
4 error.

Probable cause requires only a minimal showing.  Judge Nelson had a "substantial basis" for determining that the affidavits submitted by Special Agents Murphy and Thompson made that showing.

IT IS THEREFORE ORDERED that Defendant Manuel de Jesus Garcia-Lopez's Motion to Suppress (Doc. 57) is denied.

IT IS FURTHER ORDERED that Defendant Maria Concepcion Ramirez's Motion to Suppress (Doc. 61) is denied.

Dated this 6th day of May, 2015.

_____
Neil V. Wake
United States District Judge